UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| MAFCOTE, INC. | : | CASE NO. C-1-02-411 |
| Plaintiff | : | Judge Sandra S. Beckwith (Hogan, M.J.) |
| vs. | : | |
| CONTINENTAL CASUALTY INSURANCE COMPANY | : | (ORAL ARGUMENT REQUESTED) PLAINTIFF'S MEMORANDUM IN |
| | : | OPPOSITION TO DEFENDANT'S |
| Defendant | | MOTION FOR SUMMARY |
| | : | JUDGMENT |

Defendant's motion for summary judgment is not well taken. Plaintiff has sustained "actual loss" in the nature of business interruption losses, which are covered under the defendants' policy of insurance. In addition, plaintiff has sustained Extra Expense as set forth in and covered by defendant's policy. At the very least, plaintiff has submitted evidence concerning actual lost sales to specific customers such that construing the evidence most strongly in plaintiff's favor, reasonable minds could come to more than one conclusion as to whether plaintiff suffered business interruption and extra expense losses. Thus, summary judgment is not appropriate. Rule 56(c), Federal Rules of Civil Procedure.

**STATEMENT OF FACTS**

**Allegations of the Complaint**

Plaintiff and its affiliates were insured under defendant's Policy No. BM1098742493 with effective dates of June 8, 2001 through June 8, 2002 (the "Policy") (Complaint, ¶ 1). Plaintiff owned and operated a plant in Franklin, Ohio (Complaint, ¶ 3) which manufactured paper products some of which were supplied to its subsidiaries including Royal Consumer Products (Complaint, ¶ 4).

On or about July 16, 2001, a steam boiler at plaintiff's Franklin plant sustained an accidental loss and was damaged, rendering it operable. As a result, certain types of coated papers, which required processing by steam during production, could not be manufactured while the boiler was out of service (Complaint, ¶ 5).

On July 27, 2001, the exact nature of the loss was diagnosed and the loss was reported, first, to the insurance carrier which plaintiff thought was its then-current boiler and machinery insurance carrier (Complaint, ¶ 6), and ultimately reported to the defendant on August 14, 2001 (Complaint, ¶ 7). A rental boiler was installed after August 15, 2001 which operated until the repair was complete on the original boiler (Complaint, ¶ 9).

Defendant's policy provides coverage for: A. Damage to the boiler or machinery; B. Consequential damages; C. Business interruption losses; D. Expenses for accounting, engineering, adjusting and architectural costs to prepare, submit and adjust any claim (Complaint, ¶ 8).

Plaintiff alleges that it sustained losses of $220,697.61 as the direct and proximate result of its inability to produce coated paper products which required steam processing, from August 13, 2001 through August 15, 2001 (Complaint, ¶ 10), plus claim preparation charges of $15,000 and accountants' and auditors' expenses of an additional $20,000 (Complaint, ¶ 14).

**<u>Defendant's Answer</u>**

Defendant admitted that its Policy was in effect during the time set forth in the Complaint. Defendant also admitted that plaintiff advised that it had installed a rental boiler to replace its damaged boiler until that unit could be repaired

(Answer, ¶ 5). However, defendant also asserted that various provisions of its policy bar plaintiff from recovery. See Answer, ¶¶ 10-14.

**Pertinent Provisions of the Policy**

Defendant's Policy covered the policy period June 8, 2001 to June 8, 2002 (General Commercial Program General Declarations) and was provided to plaintiff in consideration of a premium payment of $42,000.

The Policy contains an endorsement for Combined Business Interruption and Extra Expense Actual Loss. Under this endorsement, coverage is afforded for actual loss from a total or partial interruption of business, and for extra expense necessarily incurred to operate the insured's business nearly normal as practicable during the period of restoration following an accident. There are some exclusions from this coverage but, excepted from these exclusions is loss or expense from "Lack of power, light, heat, steam or refrigeration."

The business interruption and extra expense endorsement's pertinent provisions are accurately reproduced in the defendants' memorandum at pp. 3-4.

**Deposition Testimony of Steven A. Schulman**

The deposition of Steven A. Schulman, plaintiff's President, was taken on February 27, 2003. The deposition has been filed with the Clerk.

Steven A. Schulman has been President of Mafcote, Inc. since 1988. He has worked at the company since 1964 (Schulman Depo., p. 4). Mafcote is a paper manufacturer and a "paper converter," the latter term meaning taking paper and converting it to a different form, such as making a paper cup out of a piece of paper. Affiliates of Mafcote include Millen Industries, Inc., Miami

Wabash Paper LLC and Royal Consumer Products LLC. (Schulman Depo., p. 6).

Miami Wabash Paper coats paper and paperboard. That company is 94% owned by Mafcote. (Schulman Depo, pp. 8-9). The headquarters for Miami Wabash are located at Norwalk, Connecticut. The production facilities are in Wabash, Indiana and Franklin, Ohio (Schulman Depo., p. 10). The Franklin, Ohio facility consists of a coater, two rewinders a sheeter and a trimmer. The facility employs about 50 people (Schulman Depo., p. 12).

Royal Consumer Products LLC is also owned 94% by Mafcote. It sells consumer package products (such as Inkjet paper). (Schulman Depo., p. 13). The headquarters for Royal Consumer Products are located in Norwalk, Connecticut. It has an order entry facility in Garwood, New Jersey and a manufacturing facility and warehouse in Louisville, Kentucky at which about 100 individuals are employed (Schulman Depo., pp. 14-16).

Steven A. Schulman was responsible for obtaining the insurance which is Exhibit 1 to the Complaint, a policy from Continental Casualty Insurance Company. The insurance broker he used was Earl Rynston at Genatt Associates in New Hyde Park, New York (Schulman Depo., p. 34).

In 2001, the plant manager at the Franklin facility was Robert Kaminsky (Schulman Depo., p. 43). Schulman learned of the boiler loss from Kaminsky on August 13, 2001 (Schulman Depo., pp. 46-47). Schulman was told by Kaminsky that when the boiler accident occurred, plant officials did not know it was a boiler accident. They then traced the problem to the boiler. (Schulman Depo., p. 48). The boiler is needed in order for the steam foil to operate at the plant.

(Schulman Depo., p. 50). The steam foil is an electronically controlled machine. If the boiler does not produce steam, the steam foil could not be run for any length of time. Production line No. 7 is a coater, the main coating machine at Miami Wabash's Franklin facility. The steam foil is one of the pieces of machinery on coater No. 7. Grades of paper that must be run with a steam foil cannot be run on the No. 7 without the steam foil in operation (Schulman Depo., p. 51). There is no other production line either in Franklin, Ohio or at the Wabash, Indiana facility which would duplicate what coater No. 7 did (Schulman Depo., p. 52).

Between July 27th and August 14th when the problem was diagnosed and reported to defendant, plaintiff continued to run the No. 7 coater which can be run without the steam foil, except that certain grades of paper that require the steam foil could not be run with the steam foil inoperable. (Schulman Depo., p. 56).

Defendant's adjuster suggested the installation of a rental boiler. From August 16, 2001 on, after the installation of the rental boiler, plaintiff was able to run the steam foil. (Schulman Depo., p. 60). With the rental boiler, the steam foil was able to function as it had before the loss. (Schulman Depo., p. 62).

The Franklin, Ohio facility is a 24-hour-a-day operation. It is a union plant and the contract with the Union states that they are required to work Saturdays but not Sundays. (Schulman Depo., p. 88). In response to defendant's counsel's question as to what Miami Wabash did to reduce the backlog of production once the rental boiler was in place, Mr. Schulman stated that the facility ran the third party orders which called for steam foil, describing those "third party orders" as being different from Royal Consumer Inkjet orders. (Schulman Depo., pp. 87-

88). Because Miami Wabash was busy filling third party requirements, the Franklin facility could not fulfill orders for coated paper products from Royal Consumer Products (Schulman Depo., p. 96). That is the loss claimed in this case under the defendants' business interruption Policy.

From August 16, 2001 forward, after the installation of the rental boiler, the steam foil at the Franklin plant was operable (Schulman Depo., p. 60). With the installation of the rental boiler, the steam foil was able to function as it had before the loss. It remained functional from August 16, 2001 forward. The damaged boiler was subsequently repaired (Schulman Depo., p. 62).

Mr. Schulman testified that even accepting defendants' position tthat recovery is limited to the time period of August 13 to August 15, 2001, the defendant's liability would be in excess of $232,000 because of Miami Wabash's inability to produce certain coated paper products during that time period. This amount is based upon information in three separate schedules that were submitted to the defendant insurance company. Schedule 1 is marked as Exhibit 10 to the Schulman deposition (Schulman Depo., p. 72).

With reference to Exhibit 10, the column described as "MVP Price" is a price that Miami Valley Paper was charging for similar items. The item that Royal purchased, glossy paper, served the exact same function as the item it was purchasing from Miami Valley Paper. It was a replacement of an item that Miami Valley was making. Payment was made to Cooler by Royal Consumer Products for this invoice. (Schulman Depo., p. 77). The order date to NuCote is after August 16, 2001, namely August 21, 2001, but Schulman's belief is that this date was probably several days after the order was verbally placed. However,

irrespective of that, Miami Valley Paper was backlogged with orders that required the steam foil which were not necessarily Royal Consumer Products. When Royal Consumer Products on or somewhat before August 13, 2001, could not be assured of delivery dates, immediately to satisfy contractual obligations it had to meet demand, essentially called and cancelled the orders that they had placed with Miami Wabash (formally known as Miami Valley Paper) and proceeded with finding vendors that could supply the requirement. There are orders that were cancelled that are shown in a separate document. This particular order was not previously placed with Miami Wabash. The orders that were placed are somewhat lower, slightly, than the quantity of the orders that were cancelled. Mr. Schulman testified:

> Q. Is it your testimony that the order that were placed were to replace those orders that were cancelled?
>
> A. Yes. (Schulman Depo., pp. 83-84).

Exhibit 11 is a complete list of Miami Wabash's cancelled orders (Id.). These are products that Royal Consumer Products had placed orders for with Miami Wabash and now were canceling. There may have also been cancelled orders from other customers of Miami Wabash besides Royal Consumer Products (Schulman Depo., p. 85). Permalife is a competitor and produces products similar to those produced by Miami Wabash. The amount paid by Royal Consumer Products to Permalife was $274,937.86. All of these products were shipped to the Louisville offices of Royal Consumer Products. (Schulman Depo., p. 92).

Mr. Schulman acknowledged that there was no damage to any boiler at the Louisville plant of Royal Consumer Products. However, Purchase Order 20872, which appears on Schedule Two shows and order date of August 28, 2001, which would be 12 days after the rental boiler was up and operational at Miami Wabash. Given the date required for the delivery, Miami Wabash was unable to fill this order that was placed on or about August 28, 2001 (Schulman Depo., p. 93). The reason for that was that much prior to that Royal Consumer had placed approximately 170,000 pounds or more of orders with Miami Valley for orders which Royal Consumer Products had received from customers. Royal would incur penalties if it did not deliver on time and these penalties would be "something like 20 times the magnitude of our claim against CNA." Plaintiff "had to fill those orders or we would have such, besides the loss of business, devastating claims against us." These would have been claims against Royal Consumer Products. These orders were cancelled with Miami when Miami Wabash could not give any date of when they were going to produce the product. But, Mr. Schulman testified, "certainly by this time, any realistic date of meeting the schedules had been blown since Miami could not possibly have made this by September 4th, and the orders were placed with other people, including Permalife." (Schulman Depo., p. 94).

In response to the question why if Miami Wabash was up and running, it could not have completed an order that was placed by Royal with another during the time that Miami was up and running, Mr. Schulman explained that it was because Miami Valley was busy filling third party requirements. "And if Miami had a choice of either when the boiler was repaired and defaulting on Royal

Consumer Product orders or defaulting on third party orders." The down time created a rolling backlog which started on July 16, 2001. The steam foil was not working between July 16 and August 16. The back log is not a function of the inability to use the steam foil during that number of days. This is because the amount of product that was purchased on the outside was equal to three days production with regard to the number 7 coater. If Miami Wabash had those three days available to it, they would have been able to make the production requirement for Royal Consumer, but they did not. "We were down for three days and we placed those 170,000 pound orders with third parties. For those three days we made 170,000 pounds of paper for someone else and we continued to make other paper which required the steam foil for other people with the production that we would have had for those three days placed with third parties. Production per day is 60,000 to 70,000 pounds. Three days even at 55,000 pounds would equal 160,000 pounds. The amount of orders that were cancelled and replaced with third parties is 160,000 (Schulman Depo., pp. 96-97).

**ARGUMENT**

Defendant's position in this case is that although the accident occurred on July 16, 2001, the accident was not reported to defendant until August 14, 2001. On that date, the loss was reported to Continental Casualty Insurance Company's agent, Genatt Associates, Inc. According to the policy language, liability for loss under the policy commences at the time of the accident, or 24 hours prior to the loss report to Continental Casualty Insurance Company,

whichever is later. Based on an accident date of July 16, 2001 and the report date of August 14, 2001, liability would commence on August 13, 2001.

Defendant's position also is that there is no coverage under the policy for the extra expense claim that has been presented. Coverage does not apply, says defendant, to the extra expense claim because the replacement product purchased by the Louisville plant replaced product that was to have been produced prior to the August 13, 2001 commencement to policy liability. Also, the order for that product had been cancelled prior to the August 13, 2001 commencement of policy liability.

Defendant's motion for summary judgment should be denied. During the time period August 13 through 15, 2001, before the rental boiler was installed, plaintiff sustained business interruption losses and extra expenses. Mafcote's two affiliates, Miami Wabash Paper (formerly known Miami Valley Paper, and located in Franklin, Ohio, and Royal Consumer Products, located in Louisville, Kentucky, are both "locations" within the meaning of defendant's Policy. The loss of use of the steam foil at the Franklin plant rendered it unable to fill orders for coated paper which the Louisville plant had placed with the Franklin plant. It is undisputed that during the 3-day shutdown of the steam foil, the Franklin facility could not produce coated paper. Orders for the coated paper were filled by plaintiff's competitors and were, thus, lost to the plaintiff. For this reason, defendant's Policy provides coverage for business interruption and defendant's motion for summary judgment is not, therefore, well taken.

**<u>Choice of Law and Standard of Review on Summary Judgment</u>**

Plaintiff agrees generally with the defendant's discussion of choice of law issues and the standard of review applicable to the present motion for summary judgment.

**A. <u>Defendant's Business Interruption Policy Provides Coverage for Losses Which Resulted from the August 13-August 15th Shutdown of Plaintiff's Boiler</u>**

The Court's goal when construing an insurance policy is to ascertain the intent of the parties. <u>Foster Wheeler Enviresponse, Inc. v. Franklin County Convention Facilities Authority</u> (1997), 78 Ohio St. 3d 353, 361, 678 N.E.2d 519, 526. The Court examines the insurance contract as a whole and presumes that the intent of the parties is reflected in the language used in the policy. <u>Id.</u>; <u>Kelly v. Medical Life Insurance Company</u> (1987), 31 Ohio St. 3d 130, 509 N.E.2d 411, ¶ 1 of the syllabus. The Court must look to the plain and ordinary meaning of the language used in the policy unless another meaning is clearly apparent from the contents of the policy. <u>Alexander v. Buckeye Pipeline Company</u> (1978), 53 Ohio St. 2d 241, 374 N.E.2d 146, ¶ 2 of the syllabus.

The purpose of a business interruption policy is to "do for the insured in event of a business interruption . . . just what the business itself would have done if no interruption had occurred." <u>American Alliance Insurance Company v. Keleket X-Ray Corp.</u>, 248 F.2d 920, 928 (6th Cir. 1957) (applying Ohio law).

On page 10 of its memorandum, defendant argues that "apart from the cost of the rental boiler for which Continental has already made payment, Miami Wabash did not incur any actual loss or extra expense as a result of the boiler accident." That is simply not true. It is not disputed that for a period of three

days, Miami Wabash could not produce any coated papers. It had orders for coated papers -- received from another Mafcote affiliate, Royal Consumer Products -- which it could not fulfill. Those orders were not simply delayed or produced pursuant to subsequent agreements with those customers. Those orders were lost and plaintiff has produced documentation showing that Mafcote's Louisville plant filled those orders not from coated papers supplied by the Franklin plant but, from plaintiff's competitors.

The cases cited by defendant on pages 12-15 of their memorandum are all distinguishable on their facts.

In St. Mary's Foundry, Inc. v. Employers Insurance of Wausau, 332 F.3d 989 (6th Cir. 2003) (applying Ohio law), the insured sought coverage for lost income arising from loss of customer-owned patterns in a warehouse fire. The Court held that the unambiguous "covered property" scope of the policy's business income coverage, read together with a separate "property not covered" exclusion of non-owned personal property, precluded coverage. Each of the patterns lost in the fire was custom made to produce a particular casting. The patterns were owned by the insured's customers. Per industry practice, the plaintiffs stored the patterns in a warehouse when it was not using them.

The defendant's Business Property Policy covered the warehouse. The policy, however, had a "property not covered endorsement" which expressly excluded coverage for patterns, dyes and molds not owned by the plaintiff. At page 994 of 332 F.3d, the Court stated: "Once the Policy excluded the patterns from property coverage, loss of income coverage was automatically excluded because patterns were no longer covered property."

The facts of St. Mary's Foundry are readily distinguishable from those in the case at bar. Mafcote owned both premises in Franklin and in Louisville, and defendant's Policy specifically listed both facilities as named insureds. Also, there is no exclusion in the defendant's policy which would preclude coverage. That which is not clearly excluded from the operation of an insurance contract is included in the operation thereof. Mooreman v. Prudential Insurance Company of America, 4 Ohio St. 3d 20, 445 N.E.2d 1122, 1124 (1983) (quoting Home Indemnity Company v. Plymouth, 146 Ohio St. 96, 64 N.E.2d 248, 250 (1945)). The exclusion "must be stated clearly in explicit wording setting forth with specificity exactly what is to be excluded." River Services Company v. Hartford Accident & Indemnity Company, 449 F. Supp. 622, 626 (N.D. Ohio 1977) (citing American Financial Corp. v. Fireman's Fund Insurance Company, 15 Ohio St. 2d 171, 239 N.E.2d 33, 35 (1968)). The insurer, being the one who selects the language in the contract, must be specific in its use; an exclusion from liability must be clear and exact in order to be given effect. Lane v. Grange Mutual Companies, 45 Ohio St. 3d 63, 543 N.E.2d 488, 489 (1989).

It is not disputed that the steam foil failed at the Franklin location. The result of that failure was the inability to produce coated papers. The Franklin plant had orders for coated papers which were cancelled when it was unable to provide the product. The fact that the cancelled orders came from another of plaintiff's affiliates, the Louisville plant, has no effect on plaintiff's right to recover under the business interruption loss endorsement of defendant's Policy. If, as plaintiff has demonstrated, it could not fulfill its orders for coated paper for three

days, and if those orders were not "made up" at a later time (which they were not), defendant's Policy covers that loss.

Another case cited by the defendant is Ramada Inn Ramogreen, Inc. v. Travelers Indemnity Company, 835 F.2d 812 (11th Cir. 1988). In that case, a hotel brought an action against its insurer to recover for a decline in occupancy of the hotel facility that resulted from the closing of the restaurant after it was destroyed by fire. The Court, applying clear Florida precedent holding that this type of loss is not covered by a business interruption policy, held that the decrease in occupancy was not a covered loss under the insurance company's business interruption policy. In Ramada Inn Ramogreen, the restaurant was listed separately in the insurance policy, evidencing, the Court said, the intent of the parties to treat it as a separate entity. The Court also stated further, that the fact that the hotel made no attempt to rebuild the restaurant weighed against its argument of mutual dependency. It is also significant that the insurance company in that case did pay $172,500 for loss of earnings at the restaurant. However, because the hotel was not harmed and could still accommodate the same number of patrons as before the restaurant fire, the Court relied on Florida precedent holding that this type of loss is not covered by business interruption coverage in a policy of insurance. In so doing, the Court distinguished Studley Box and Lumber Company v. National Fire Insurance Company, 85 N.H. 96, 154 Atl. 337 (1931), where a fire in a stable burned some of the horses which were used in the operation of a lumber plant. Without the horses, the plant was unable to continue its operations. That Court held that the insured would be compensated for the partial suspension of its business.

In the case now before the Court, the plaintiff, Mafcote, was injured in its business when the boiler accident at the Franklin plant resulted in a loss of orders. Both the Franklin plant and the Louisville plant are named insureds under the defendant's Policy. It cannot be denied that they are separate facilities, one being located in Ohio and the other in Kentucky. However, it cannot be disputed that plaintiff, Mafcote, which is the 94% owner of both of its affiliates, sustained damage. Plaintiff does not claim that it was required to discontinue its operation entirely as the result of the boiler accident. However, as in Studley Box and Lumber Company, supra., the plaintiff is entitled to recover losses for the partial suspension of its business, that partial suspension comprising a failure to supply coated paper products to its customers from August 13 through 15, 2001.

Swedish Crucible Steel Company v. Travelers Indemnity Company, 387 F. Supp. 231 (E.D. Mich. 1974), also cited by the defendant, held that where a policy on an insured's foundry covered business losses resulting from direct losses to describe property and excluded consequential or remote losses, the policy did not cover business losses sustained to the insured foundry because of a fire in the insured's nearby plastics business in which many molds, dyes and patterns utilized by the foundry were destroyed or damaged. The facts of the case are somewhat similar to those in St. Mary's Foundry, supra., but are nevertheless distinguishable from those in the present case. In Swedish Crucible Steel Company, the Court found, 387 F. Supp. at 233, that the policy covered only one specific building (out of several used in the business). The Court stated: "Since fire losses can be recovered for only the one building, it should

logically follow that business losses would likewise be recoverable for only the losses occasioned by destruction to the one, covered building." Id. The Court found that there had to be damage to the covered building -- which was not damaged in the fire -- before there could be business interruption coverage.

Here, plaintiff had obtained a policy which expressly provides coverage not only to the Franklin plant but to the Louisville plant as well. Both of these plants are listed as named insureds under defendant's Policy. Unlike Swedish Crucible Steel Company, therefore, defendant's Policy expressly applies not only to the Franklin facility but also to the Louisville plant.

In Gregory v. Continental Insurance Company, 575 S.2d 534 (Miss. 1990), cited by plaintiffs, a country club sued its multi-peril insurer after it refused to pay for business interruption loss caused by trees blowing onto the golf course during a hurricane. The Court held that the business interruption endorsement covered only business losses resulting from damage to buildings housing the pro shop and restaurant, not losses from the shutdown of the entire golf course. The Court stated that the policy covered loss of business for whatever time the pro shop and the restaurant were out of business due to damage to those buildings. Nothing in the Gregory case would prevent coverage under defendant's Policy in the case now before the Court.

Finally, defendant cites Protection Mutual Insurance Company v. Mitsubishi Silicon Am. Corp., 164 Ore. App. 385, 992 Pac. 2d 479 (1999). In that case, the insurer sought a declaration that a general property casualty policy did not cover economic losses which the insured sustained in its silicon wafer manufacturing operation when the city's water treatment facility had to shut down

due to flooding. The Court held that the policy did not contain the necessary endorsement for losses of this nature to be covered.

In Protection Mutual Insurance Company, the insured's general property casualty policy's Flood Endorsement contained a "limits of liability" clause. The Court held that this did not qualify as the special endorsement which the flood exclusion in the policy's Service Interruption Endorsement required to be present before business interruption coverage would be provided or service interruptions caused by flooding at the utility service facilities. The Flood Endorsement added coverage only for property damage and the Limits of Liability clause was not a coverage provision and did not alter or expand the scope of coverage. Rather, it merely set the amount of the insurer's liability for the added flood coverage. Thus, economic losses which the insured sustained in its silicon wafer manufacturing operation when the city's water treatment facility had to shut down due to flooding were not covered.

It is of significance that in Protection Mutual Insurance Company, none of the insured's losses resulted from flood. Rather, the losses were the indirect consequences of flooding at the site of the city's water supply and waste treatment facility. The case is, thus, distinguishable from the case at bar. Here, plaintiff's loss was the result of a boiler accident at its Franklin facility.

Defendant also argues that plaintiff's claim is barred because it is seeking a "contingent business interruption loss" for which the policy does not provide coverage. Defendant argues that "most business interruption losses arise as a consequence of physical damage to property at the insured's own premises, but an insured can also suffer a business income loss because of physical damage

to property at locations it does not own or control but on which the insured depends in some way." (Defendant's Memorandum at 15). Defendant's discussion of contingent business interruption loss is irrelevant to the issues now before the court. Plaintiff owned the Franklin facility where the accident happened. Plaintiff also owned the Louisville facility which had placed orders with the Franklin facility for coated paper products, orders which Franklin could not supply. In Pentaire, Inc. v. American Guaranty & Liability Insurance Company, 2003 WL21804874 (D. Minn. 2003), the case arose from the plaintiff's losses that were indirectly caused by an earthquake in Taiwan in September 1999. The plaintiff sought reimbursement for its losses from its insurer. One of the plaintiff's subsidiaries purchased portable power supply units manufactured in Taiwan by a company not affiliated with the plaintiff. The Taiwan earthquake damaged an electrical substation that supplied power to the manufacturer and, as a result, the manufacturer could not produce product for approximately two weeks. That two week delay came right at the Christmas selling season and the plaintiff decided to airfreight the products rather than shipping them by sea, which produced a difference in cost of about $630,000. The insurer denied the claim, which was submitted for shipping cost under an all-risk policy. The Court noted that the policy defined the insured as "Pentaire, Inc. and any affiliated, subsidiary and associated or allied companies and/or corporations as now exist or may hereafter be constituted or acquired." There was a "contingent time element" coverage extension to the policy, but under its terms, the plaintiff had to establish that its Taiwan supplier had suffered "direct physical loss of or damage to its real or personal property," and there was no such direct physical damage to the

Taiwan supplier's property. For that reason, the Court in Pentaire upheld the denial of coverage. There is no question, however, that if the Taiwan supplier had been an affiliate or subsidiary of Pentaire, Inc., or if that supplier, even though not affiliated had sustained actual damage, there would have been coverage.

This Court need not explore the ramifications of such contingent liability losses since in the case at bar both the Louisville and Franklin facilities were owned by the plaintiff and since the Franklin facility actually sustained damage in the form of a boiler accident.

Plaintiff has provided a reasonable calculation of its business interruption loss, cf., Georgia-Pacific Corporation v. Allianz Insurance Company, 977 F.2d 459 (8th Cir. 1992); Rubbermaid, Inc. v. Hartford Steam Boilers Inspection Company, Inc., 96 Ohio App. 3d 406, 645 N.E.2d 116 (1994); see also Hardrives Paving and Construction Company, Inc. v. Hartford Steam Boiler Inspection and Insurance Company, 137 Ohio App. 3d 270 (2000), and defendant is thereby not entitled to summary judgment.

**CONCLUSION**

For the reasons set forth herein, plaintiff respectfully submits that defendant's motion for summary judgment is not well taken and should be denied.

/s/ James M. Moore
James M. Moore (#0009476)
LINDHORST & DREIDAME
312 Walnut Street, Suite 2300
Cincinnati, OH 45202-4091
(513) 421-6630 (telephone)
(513) 421-0212 (facsimile)
Trial Attorney for Plaintiff

Of Counsel:

LINDHORST & DREIDAME
312 Walnut Street, Suite 2300
Cincinnati, OH 45202-4091
(513) 421-6630 (telephone)
(513) 421-0212 (facsimile)

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing has been transmitted by regular U.S. Mail to John C. Scott, Esq. Faulkner & Tepe, LLP, 2200 Fourth & Vine Tower, Cincinnati, OH 45202; and Frederick R. Mindlin, Esq., Mound, Cotton, Wollan & Greengrass, One Battery Park Plaza, New York, New York 10004-1486 this 1st day of December, 2003.

/s/ James M. Moore
James M. Moore
Attorney at Law

375658